**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEROME N., <br><br>      Plaintiff, <br><br>  v. <br><br> KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY, <br><br>     Defendant. | Civ. A. No. 3:20-cv-13087 (GC) <br><br> **MEMORANDUM OPINION** |

**CASTNER, District Judge**

   **THIS MATTER** comes before the Court upon Jerome N.'s ("Plaintiff") appeal from the final decision of the Commissioner of the Social Security Administration ("Defendant" or the "Commissioner"), denying Plaintiff's application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C § 423, *et seq.* The Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g), and reaches its decision without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court affirms the Commissioner's decision to deny Plaintiff social security benefits.

## I. BACKGROUND

### A. Procedural History

   Plaintiff filed an application for disability insurance benefits on May 25, 2017, alleging disability beginning on May 25, 2017. (Administrative Record ("AR") 139.) Plaintiff's claim was denied initially on September 14, 2017, and again upon reconsideration on February 14, 2018. (*Id.*

at 141-144, 148-151.)  A hearing was held before an Administrative Law Judge ("ALJ") on July 15, 2019.  In a decision dated August 19, 2019, the ALJ found that Plaintiff was not disabled at any point from the alleged onset date through the date of her decision.  (*Id*. at 16-26.)  On August 11, 2020, the Appeals Counsel denied further review.

The issue before the Court is whether the decision of the ALJ that Plaintiff was not under a disability from May 17, 2017, through August 19, 2019 (the date of the decision), is supported by substantial evidence.

### B.     Factual Background

At the time of the hearing, Plaintiff was a fifty-five-year-old male born on November 20, 1963.  Plaintiff alleges disability on May 25, 2017, due to depression, anxiety, cognitive difficulties, difficulty remembering, difficulty learning, difficulty following directions, difficulty understanding, and post-traumatic stress disorder.

At the hearing, Plaintiff testified that he has a twelfth-grade education and has vocational certificates he earned after his unemployment benefits ran out.  (*Id*. at 77.)  He can speak, read, and write English.  (*Id.* at 77.)  He has a driver's license and is able to drive, but he testified that he only drives about two times a month.  He currently lives with his wife and three teenagers who are in college.  (*Id*. at 78.)  He has past work experience as a webmaster/internet technician from 2000 through 2012, and more recently as a search analyst for Mylance, a search engine company.  (*Id*. at 82-83, 119.)  His job required him to work on the computer, talk to managers, and sit in on IT meetings.  It was an in-house position that required no contact with the general public.  Prior to Mylance, he worked as a "gopher" at the Lacardi car dealership and as a car salesman at a Fred Beans dealership for about six months where he made approximately $4,000.  (*Id.* at 119.)  Plaintiff was injured when he slipped on the ice while pushing a car at Fred Beans during a snowstorm.

Plaintiff had a tibia/fibula injury from that incident which required four hospital stays. Plaintiff testified that he has residual symptoms from that injury including an inability to walk distance and "push weights" at the gym.

Plaintiff has received treatment for various conditions, including: hyperlipidemia; general anxiety disorder; depression; insomnia; post-traumatic stress disorder ("PTSD"); attention deficit hyperactivity disorder ("ADHD"); hypertension; fractured tibia and fibula; MRSA staph infection; tibial veinous thrombus; and a hernia.  (*Id.* at 62, 130, 275, 386, 396, 439, 442.)  Plaintiff is prescribed Adderall, Aspir-81, Atenolol, Azelastine, Bupropion, Chlorthalidone, Epinephrine, Klonopin, Losartan, Meloxicam, Nabumetone, Naproxen, Rexulti, Simvastatin, Trazadone, Xanax and Ventolin.  (*Id.* at 38, 42, 44, 292-93, 318-22, 360-64.)

Plaintiff testified that he gets "very high anxiety" talking to people, which results in his heart pounding and an inability to focus as his mind starts to wander and goes blank. (*Id*. at 76, 81.)  He also reports having problems with his memory where he will not remember something he may have watched the day before on television, remember things he had to do, or what happened at work. (*Id*. at 77.)  Over the years, Plaintiff reported that he had been on Effexor, Wellbutrin, and Zoloft for depression, but that they were not helpful.  He also was prescribed Adderall and Xanax, which he found somewhat helpful, especially with his depression.  (*Id*. at 651.)

Plaintiff testified that he takes painkillers for arthritis in his shoulder.  He does not see doctors for arthritis, but he gets painkillers when he asks for them. (*Id*. at 91.)  He is only able to walk or stand continuously for 20 minutes without discomfort due to pain in his leg, but that he does not seek treatment for same. (*Id*. at 95.)   He stated that he can only sleep an hour at a time uninterrupted.  (*Id*. at 96.)  He stated that he only bathes about once or twice a week due to a lack of energy.  (*Id*. at 92.)  He stated he does not have any issues interacting with medical staff or other

patients at doctor appointments but does not go to the grocery store alone as it gives him anxiety. (*Id.* at 97.)  Plaintiff testified that he is able to perform household tasks like mopping, sweeping, washing the dishes, and mowing the lawn.  (*Id.* at 92-94.)

Plaintiff's wife also testified during the hearing. She stated that she calls Plaintiff three to four times a day while she is at work to check in on him.  (*Id.* at 99.)  She stated that Plaintiff is easily overwhelmed, irritable, and forgetful and due to these characteristics and she does not believe Plaintiff can work.  (*Id.* at 100-01.)

On an Adult Function Report completed as part of his disability determination application, Plaintiff reported that his day consists of showering and shaving sometimes, going to physical therapy, looking at the internet, and watching television.  (*Id.* at 261-268.)  He also spends a lot of time worrying and feeling overwhelmed.  He cares for three teenagers, cooks, cleans, brings home food and monitors their activities. He feeds and cleans up after his cats. (*Id*. at 261.)  He reported that it takes him a lot of time to go to sleep.  He sometimes forgets to take his medications.  When Plaintiff leaves his home, he either walks, drives, or rides in a car.  He shops in stores and on the computer twice a month.  He is able to pay bills, handle a savings account, count change, and use a check book, but he worries about paying the bills and running out of money.  His hobbies are mostly watching television.  (*Id*. at 264.)  Socially he uses Facebook and goes out with his wife to visit friends sometimes but describes himself as "very anti-social."  He feels that his neighbors do not like him, and rarely sees his family.  He described his change in social activities due to being majorly depressed, full of anxiety, and shaky.  He reported sleeping 10-12 hours a day, feeling nauseous in the mornings, and has not worked out in a gym in three years.  He reported not getting along with previous bosses, and that he cannot handle stress.  He does not like changes in routine and does not always comprehend information given to him.  He remarked that he has gone through

4

a nasty divorce where there was abuse, and that he became massively depressed after losing his job. He also has lost many family members, feels shell shocked and overwhelmed, and has tried very hard to find work but has been unable to do so. He sometimes asks himself if life is worth living. (*Id.* at 268.)

The ALJ engaged the expertise of a VE at the hearing. The VE testified that Plaintiff would not be able to perform past work in the form of car salesman, [Dictionary of Occupational Titles ("DOT")] Code 273.353-010; search analyst, DOT Code 199.267-034; and web designer, DOT Code 030.167-018. (*Id.* at 103.) The ALJ solicited testimony and asked the VE a series of hypothetical questions that included Plaintiff's restrictions. (*Id.* at 104.) The VE testified that Plaintiff would be able to perform other work, namely in the form of hand packager, DOT Code 920.587-018; package sealer, DOT Code 920.685-074; and staple machine operator, DOT Code 692.685-202, and that these positions are sufficiently available in the national economy. (*Id.*)

## C.    The ALJ's Decision

On August 19, 2019, the ALJ issued her decision finding that Plaintiff is not disabled. (*Id.* at 16-26.) The ALJ found that Plaintiff met the insured status requirements under the Social Security Act through December 31, 2021. (*Id.* at 18.) The ALJ then set forth the Social Security Administration's five-step sequential process for determining whether an individual is disabled. (*Id.* at 18-25.) At step one of the analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity[1] since May 25, 2017, the alleged disability onset date. (*Id.* at 18.) At

---

[1] "Substantial gainful activity is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. Substantial work activity "involves doing significant physical or mental activities. [A claimant's] work may be substantial even if it is done on a part-time basis or if [he] do[es] less, get[s] paid less, or ha[s] less responsibility than when [he] worked before." *Id.* § (a). "Gainful work activity is work activity that the claimant do[es] for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." *Id.* § (b).

step two of the analysis, the ALJ found that Plaintiff had the following severe impairments: status

post fractures of the lower limb, generalized anxiety behavior, affective disorder, PTSD, and

ADHD. (*Id.*)

At step three, the ALJ determined, after a comprehensive examination of Plaintiff's

medical conditions, that none of Plaintiff's impairments, or combination of impairments, met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (hereinafter, "Appendix 1"), 20 C.F.R. Part 404.1525, and 20 C.F.R. Part 404.1526

(*Id.* at 18-20.)   The ALJ next found that Plaintiff possessed the residual functional capacity

("RFC") to perform medium work[2] as defined in CFR 404.1567,

> except lifting and carrying 50 pounds occasionally and 25 pounds
> frequently, and sitting, standing, and walking six hours in an eight
> hour workday. The claimant can frequently climb ramps and stairs,
> balance, kneel, stoop, and crouch. The claimant cannot crawl, climb
> ladders, ropes, or scaffolds, or work around hazards, including
> moving mechanical parts or at unprotected heights. The claimant
> can understand and execute simple, routine tasks where production
> is measured no earlier than the end of the workday; have occasional
> contact with coworkers and supervisors; have incidental contact
> with the public but not with tasks that involve direct customer
> service; and can make simple decisions and adapt to occasional
> changes in essential work tasks.

(*Id.* at 20-21.)   At step four, the ALJ found Plaintiff incapable of performing past relevant work.

(*Id.* at 25.)   At step five, relying on the testimony of the VE, the ALJ found that there are jobs that

exist in significant numbers in the national economy that Plaintiff can perform considering his age,

---

[2]  To determine the physical exertion requirements of work in the national economy, jobs are
classified  as sedentary, light, medium, heavy, and very heavy. These terms have the same
meaning as they have in the Dictionary of Occupational Titles, published by the Department of
Labor. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine
that he or she can also do sedentary and light work. 20 CFR § 416.967(c).

education, work experience, and RFC.  (*Id.* at 25-26.)  Accordingly, the ALJ found that Plaintiff

had not been disabled from May 25, 2017, through the date of the decision.  (*Id*. at 26.)

## II.   LEGAL STANDARD

### A.   Disability Determination

An individual is "disabled" and therefore eligible for disability insurance benefits if such

individual is "unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§ 423(d)(1)(A).  The individual's impairment must be severe to the point that the individual cannot

engage in his previous work or in "any other kind of substantial gainful work which exists in the

national economy," *i.e.*, work that exists in significant numbers either in the region where such

individual lives or in several regions of the country.  42 U.S.C. § 423(d)(2)(A); *Plummer v. Apfel*,

186 F.3d 422, 427-28 (3d Cir. 1999).  A physical or mental impairment is one "that results from

anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner employs a five-step sequential evaluation process for disability claims.

*See* 20 C.F.R. § 404.1520(a)(4).  The claimant bears the burden of proof for the first four steps of

the analysis, and the burden shifts to the Commissioner for the fifth step.  *Poulos v. Comm'r of

Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

First, a claimant must not have engaged in substantial gainful activity since the alleged

disability onset date.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Second, the Commissioner considers "the

medical severity of [the claimant's] impairment(s)."  *Id.* § 404.1520(a)(4)(ii).  The claimant must

have a "medically determinable impairment" or combination of impairments severe enough to

limit the claimant's ability to perform basic work activities for a continuous period of at least twelve months. *Id.*; *id.* § 404.1509.  The claimant bears the burden of establishing the first two requirements, and failure to satisfy either automatically results in denial of benefits. *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If the claimant satisfies that burden at steps one and two, the claim proceeds to the third step.  At step three, the Commissioner considers the "medical severity of [the claimant's] impairment(s)." *Id.* § 404.1520(a)(4)(iii).  The impairment or impairments must meet or equal a listing in Appendix 1 of C.F.R. Part 404, Subpart P. *Id.* § 404.1520(d).  The impairment or impairments are "medically equivalent to a listed impairment . . . if [they are] at least equal in severity and duration to the criteria of any listed impairment." *Id.* § 404.1526(a).  If the claimant can make a sufficient showing at step three, the claimant is deemed disabled. *Id.* § 404.1520(a)(iii).

However, if the claimant fails to make a sufficient showing at the third step, the analysis proceeds to an evaluation of the claimant's RFC and past relevant work at the fourth step. *Id.* § 404.1520(a)(4)(iv).  RFC is the most the claimant can perform in a work setting despite his or her limitations. *Id.* § 404.1545(a)(1).  The Commissioner "assess[es] [the claimant's] residual functional capacity based on all the relevant evidence in [the] case record," and "consider[s] all of [the claimant's] medically determinable impairments," including ones that are not "severe" pursuant to §§ 4041520(c), 404.1521, and 404.1523. *Id.* § 404.1545(a)(1)-(3).  The Commissioner assesses RFC based on "all of the relevant medical and other evidence." *Id.* § 404.1545(a)(3).  Past relevant work is "work that [the claimant] ha[s] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." *Id.* § 404.1560(b)(1).  "The claimant bears the burden of demonstrating an inability to return to [his]

past relevant work." *Plummer*, 186 F.3d at 428 (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)).

If the claimant is incapable of performing his past relevant work, the analysis proceeds to the fifth and final step. *See id.* § 404.1520(a)(4)(iv)-(v); *Plummer*, 186 F.3d at 428. At step five, the claimant must be unable to adjust to other work in light of her RFC, age, education, and work experience to be considered disabled. *See id.* § 404.1520(a)(4)(v), (g). Before denying a claim at step five, the Commissioner must show that the claimant is capable of other work existing "in significant numbers in the national economy." *Id.* § 404.1560(c)(2); *see also Poulos*, 474 F.3d at 92.

### B.    Standard of Review

District courts may "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the decision, the court determines whether the ALJ's findings are supported by substantial evidence. *See id.*; *see also Poulos*, 474 F.3d at 91. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance of the evidence." *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971) (internal quotation marks and citation omitted).

The district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). Thus, this limitation on a reviewing court's discretion applies "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). The Court must "review

the record as a whole to determine whether substantial evidence supports a factual finding." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing *Schaudeck v. Comm'r*, 181 F.3d 429, 431 (3d Cir. 1999)).  "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."  *Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

## III.   DISCUSSION

Based on the Court's review of the ALJ's decision (*see* AR 16-26), and the Administrative Record submitted by the Commissioner (*see generally* AR), the Court finds good cause to affirm the Commissioner's finding that Plaintiff is not disabled.  Notably, in reaching a decision, an ALJ must evaluate the evidence and explain the reasons for accepting or rejecting evidence.  *See Cotter*, 642 F.2d at 706.

Plaintiff must also demonstrate the existence of a medically determinable impairment by objective medical evidence. Under federal regulations, a medically determinable impairment

> must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Therefore, a physical or mental impairment must be established by objective medical evidence from an acceptable medical source. **[The Social Security Administration] will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).**  After [the Social Security Administration] establishes if [the claimant] has a medically determinable impairment(s), then [its officials] determine whether [the claimant's] impairment(s) is severe.

20 C.F.R. § 404.1521 (emphasis added); *see* 42 U.S.C. § 423(d)(3).  "Objective medical evidence means signs,[3] laboratory findings,[4] or both."  20 C.F.R. § 404.1502(f).  Plaintiff bears the burden of proof for the first four steps of the sequential analysis.  *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91-92 (3d Cir. 2007); *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

Here, the ALJ provided sufficient reasoning for the Court to determine that her findings are supported by substantial evidence.

In support of his appeal, Plaintiff argues (1) that the ALJ's findings that Plaintiff's conditions were not of a level of severity that meet the requirements of the Listings of Impairments is not supported by an adequate rationale and is not supported by substantial evidence; (2) the ALJ's decision as to Plaintiff's RFC is not supported by substantial evidence; and (3) the ALJ's

---

[3] According to the regulations, "signs"

> means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms).  Signs must be shown by medically acceptable clinical diagnostic techniques.  Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated.

20 C.F.R. § 404.1502(g).

[4] The regulations define "laboratory findings" as:

> [o]ne or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests.

20 C.F.R. § 404.1502(c).

decision that Plaintiff could engage in alternative work is not supported by substantial evidence. (Pl.'s Moving Br. 2, 17-21, ECF No. 10.)  The Court will address these arguments in turn.

### A.  Plaintiff's Medical Conditions at Step 2

#### 1.  *Plaintiff's Mental Health Impairments*

Plaintiff has a history of depression, anxiety, ADHD, and post-traumatic stress and has undergone psychological counseling and therapy for the same.  In her decision, the ALJ found that Plaintiff had only "moderate" limitations in the areas of understanding and memory resulting from those conditions.  Plaintiff argues that the ALJ overlooked a therapist's conclusion that Plaintiff has "extreme' problems in those areas that would preclude his functioning in a work environment. Plaintiff argues that there is no "logical connection" to the ALJ's findings.

The following is a summary of Plaintiff's treatment for his mental health impairments. Plaintiff presented at Richard Hall Community Center for mental health treatment in May through June 2017 (Exhibit 7F, AR 602-643.)  At the intake session, Plaintiff reported no chronic pain or chronic medical conditions.  He reported depression due to losing his job and his divorce.  He reported that his ex-wife was physically abusive to him.  He reported some suicidal ideation, but hospitalization was not required as he was considered low risk.  (*Id*. at 613.)  He reported crying often, feeling no confidence, sleeping 6 hours a night and having an inability to focus.  In his self-assessment, he was generally positive and considered himself capable of change and growth, able to get along easily with others and is active, compassionate, friendly, healthy, hopeful, humorous and intelligent. (*Id*. at 615.)

On the mental status examination, Plaintiff was depressed, and his affect was blunted.  His speech was clear, and his thought process was goal oriented with no evidence of abnormal content. (*Id*. at 616.)  His insight and judgment were fair, he was alert, and his memory was normal. His

general behavior was cooperative.  (*Id*. at. 617.)  Plaintiff began the process for undergoing treatment, but on June 16, 2017, he reported that he was working with a clinician at Jewish Family Services that he had found medication management elsewhere and requested that his case be closed.  (*Id*. at 639-641.)

On June 20, 2017, Plaintiff was seen at Jewish Family Services for mental health treatment services.  (8F, *Id*. at 602-643; 13F, *Id*. at 784-787.)  Jerry Starr, LCSW reported that Plaintiff was seen for four sessions in 2014, at which time he was diagnosed with Bipolar I Disorder, single episode.  In 2017, he returned for seven sessions and was diagnosed with adjustment disorder, with mixed anxiety and depressed mood. His counseling focused on his unemployment status, the stress of not working, and financial difficulties.  (*Id*. at 644.)

Finally, Plaintiff visited with Olayinka Aramide, a psychiatric mental health nurse practitioner at Universal Behavioral Health for depression precipitated by family problems. (Exhibits 9F, 12F, 14F, 16F, 17F, 19F); (AR 645-652, 763-783, 788, 794-795.)  Treatment notes indicate that he was referred to this practice by his therapist for psychopharmacological intervention, and that he saw Nurse Aramide every two weeks.   Nurse Aramide's noted that Plaintiff's depression symptoms were associated with a depressed mood, feelings of sadness, crying spells, poor appetite, feelings of hopelessness and helplessness, and an occasional passive death wish. He reported that his medical conditions and financial problems contributed to his depression and anxiety.  Plaintiff was treated with Wellbutrin and Klonopin for depression and anxiety, Adderall for inattention, and Trazadone for insomnia.  In July, August, and September 2017, he was seen for medication management and supportive therapy.  The assessment at the time stated Plaintiff was "moderately depressed and anxious."  (*Id*. at 772, 774, 775.)  In November 2017, Plaintiff appeared appropriately and neatly dressed and was well groomed.  His mood and

affect were appropriate, euthymic, and anxious.  His thought process was logical and goal oriented, but his insight and judgment were limited.  He had an improved mood, though depressed and anxious.  (*Id*. at 800.)  In December 2017, he once again appeared well groomed and oriented to time, place, and person.  However, his concentration, insight, and judgement were limited.  He was unimproved and appeared sad, depressed, and anxious.  (*Id*. at 804).  During that same period, Ms. Aramide observed that Plaintiff demonstrated no evidence of suicidal ideation, homicidal thoughts, hallucinations, or more than moderate depression or anxiety.  Plaintiff remained under Nurse Aramide's care on a monthly basis from February 2018 to May 2019.  It was noted throughout that time period that his depression was moderate.

Under Listings 12.04 (Depressive, bipolar and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), and 12.15 (Trauma and stressor-related disorders), Plaintiff must fulfill the Paragraph "A" criteria, and fulfill either the paragraph "B"[5] or "C"[6] criteria of 20 C.F.R. pt. 404, subpt. P, app. 1.[7]  To satisfy "B" criteria, Plaintiff must have at least one extreme or two

---

[5] 20 C.F.R. pt. 404, subpt. P, app. 1; listing 12.00(A)(2)(b) states:

> To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 12.05.).

[6] 20 C.F.R. pt. 404, subpt. P, app. 1; listing 12.00(A)(2)(c) states:

> To satisfy the paragraph C criteria, your mental disorder must be "serious and persistent;" that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both "C1" and "C2" (see 12.00G). (When we refer to "paragraph C" or "the paragraph C criteria" in the introductory text of this body system, we mean the criteria in paragraph C of listings 12.02, 12.03, 12.04, 12.06, and 12.15.)

[7] As the Plaintiff noted, the ALJ "only considered the 'B' criteria, implicitly finding that in each case the 'A' criteria of those specific listings were met." (Pl.'s Moving Br. 17-18.) Therefore, the

marked limitations in the following four areas: 1) understand, remember, or apply information; 2) interact with others; 3) concentrate, persist, or maintain pace; and 4) adapt or manage oneself.  20 C.F.R. § 404.12.00(A)(2)(b).  "Extreme" is defined as "not able to function in this area independently, appropriately, effectively, and on a sustained basis," Appendix 1 at 12.00(F)(2)(e), and "marked" is defined as "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited," Appendix 1 at 12.00(F)(2)(d).

As noted in Step 2 above, the ALJ found that Plaintiff has the following severe mental impairments:  generalized anxiety behavior, affective disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder; and that these impairments have lasted at least twelve months, satisfying the de minimis threshold of severity.  (20 CFR 404.1520(c)).  However, it was the ALJ's finding that these conditions caused Plaintiff no more than minimal limitations.   In making her determination, the ALJ considered singly and in combination the "B" criteria listings of 12.04, 12.06, and 12.15.  Specifically, the ALJ found:

> In understanding, remembering, or applying information, the claimant has a moderate limitation. In the claimant's Function Report, he alleged that he needs reminders (5E and 8E). However, in multiple examinations, the claimant was observed to have intact memory and judgment (17F). In addition, the medical record contains little evidence suggesting that the claimant needed reminders for the many medical appointments or clarifications of the medical treatment plan. Overall, the records show that the claimant has no more than moderate limitations in this domain of functioning.
>
> In interacting with others, the claimant has a moderate limitation. In the claimant's Function Report, he reported difficulty interacting with others (5E and 8E). However, there are no reported issues interacting with the medical staff and during the evaluations, doctors described the claimant as friendly and cooperative (17F).

---

Court will not engage with "A" criteria under the Listings. Additionally, as Defendant notes, "Plaintiff does not argue that he meets or equals the "C" criteria." (Def.'s Opp'n Br. 9, ECF No. 18, f.n. 2.)  As a result, any argument relating to the "C" criteria is waived as the Court's review is limited to the arguments Plaintiff raised in their appeal.

Nonetheless, the claimant's depression and anxiety had been characterized as "moderate" (17F). Taking account of the claimant's subjective allegations, the undersigned finds that the claimant has up to moderate limitations interacting with others.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. In the claimant's Function Report, [the wife] stated that he can only stay focusing and concentrating (5E and 8E). However, the claimant's mental status examinations indicate that he has normal speech, and intact judgment and insight (17F). Nonetheless, the claimant was diagnosed with major depressive disorder and various other mental disorders, which treating physicians characterized as "moderate" (1A; 3A; 17F). In light of the evidence as a whole, the claimant has no more than moderate limitations in this domain of functioning.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant stated that he is unable to perform personal hygiene care such as dressing, combing his hair, or shaving (5E and 8E). However, treating physicians observed that the claimant was appropriately groomed and did not present in a disheveled manner (17F). Additionally, the claimant stated that he can drive and manage his finances, and care for his children (5E and 8E). Furthermore, there is an absence of evidence demonstrating that the claimant is significantly limited in his ability to take awareness of hazards or requires excessive supervision while performing basic day-to-day tasks. Accordingly, the claimant has only moderate limitations in adapting or managing himself.

(AR 19-20.)

However, it was not only the ALJ's own determination that Plaintiff's mental health impairments did not meet or equal the listings found in Listings 12.04, 12.06, and 12.15. The ALJ also relied on the State Agency Medical Consultant, Fred Eisner's psychiatric review technique (Exhibit 1A) as follows:

We fully considered the medical opinions and prior administrative medical findings in your case as follows: In September 2017, DDS medical consultant, Fred Eisner, Ph.D., stated that the claimant has up to moderate limitations maintaining social functioning, performing activities of daily living, and maintaining concentration, persistence or pace (1A).

(*Id*. at 23). With respect to supportability and persuasiveness, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical

source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). With respect to "consistency," the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).   It was the ALJ's finding that Ms. Aramide's opinions were not persuasive based on the totality of the evidence of the record, and he explained his findings in detail in her decision.  Therefore, Plaintiff's argument that there is no "logical connection" to ALJ's findings is not supported by the record.

### 2. *Plaintiff's Tibia/Fibula Injury*

As noted above, in February 2015, Plaintiff fractured his right tibia-fibula while at work and he underwent a surgical repair involving the placement of hardware.  (*Id*. at 401, 439-43, 445.) About two years later, in April 2017, Plaintiff reported pain in his right ankle with ambulation which began six months prior, especially over the surgically placed hardware.  (*Id*. at 424, 587.) Plaintiff then underwent surgery to remove the hardware in May 2017.  (*Id*. at 426, 29- 30.)  A few days later, Plaintiff sought care for pain at the surgical site.  (*Id*. at 487.)  Plaintiff had limited range of motion, but normal strength and intact sensation.  (*Id*. at 480.)  X-rays of Plaintiff's right knee and ankle revealed no acute findings, and an ultrasound of Plaintiff's left leg revealed no deep vein thrombosis.  (*Id*. at 482-83.)  At a follow up appointment later in May 2017, Plaintiff's incisions were healing well, and he had a non-tender range of motion.  (*Id*. at 597.)  In June and September 2017, Plaintiff had moderate tenderness and effusion in the right knee, but a knee x-ray revealed no evidence of degenerative changes or significant abnormality.  (*Id*. at 755, 761.)

Physical therapy was recommended, which he underwent from May 24, 2017, to August 27, 2017.  (Exhibit 10F, *id.* at 653-749.)   Initially, Plaintiff's pain was rated between a three and eight out of ten.  His rehab potential was rated as fair to good.  Plaintiff generally tolerated the therapy with only mild pain and difficulty.  (*Id*. at 672, 675, 681, 691, 700, 703, 709, 716, 719, 728 731, 740, 743,746.)  His physical therapist noted that Plaintiff had "minimal" gait abnormality without an assistive device, decreased pain, improved strength, and improved functioning.  (*Id*. at 719, 728, 734.)  Physical therapy notes from August 27, 2017, indicated that his pain had decreased to a 2/10 level; he had decreased swelling, some improvement to his knee, and good progress in the lower extremity functioning.  (*Id*. at 748.)  In September 2017, Plaintiff reported his symptoms were improving from physical therapy, but they worsened after stopping physical therapy.  (*Id*. at 758.)  A home exercise program was recommended.  With regard to leg injury, the ALJ made the following findings:

> The claimant's alleged physical impairment does not meet or equal a medical listing under 1.04 because the record does not demonstrate or compromise of a nerve root (including the cauda equina) or the spinal cord with additional findings of: A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising; or B) spinal arachnoiditis; or C) lumbar spinal stenosis resulting in pseudo claudication….
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(*Id.* at 19, 21-22.)  For example, the ALJ pointed to physical therapy notes from May and July 2017 noted above, which showed only mild complaints of pain.  (Exhibit 10F, 7, 20, 23, 29, 39, 48, 51, 67, 76 and 94.)  As noted above, the therapist's notes indicated that Plaintiff had "minimal" gait abnormality and improved strength and functioning.  (*Id.* at 67.)

In evaluating Plaintiff's leg injury, the ALJ also relied on Toros Shahinian, M.D., the state agency physician, who found that Plaintiff could lift and carry up to 50 pounds, frequently stoop, kneel, crouch, and crawl, as well as occasionally climb ladders, ropes, and scaffolds, and frequently climb ramps and stairs.  Dr. Shahinian also added that Plaintiff should avoid concentrated exposure to extreme cold, heat, wetness, humidity, and hazards.  (Exhibit 1A, *id.* at 114-116.)  Additionally, in February 2018, Samuel Wilchfort performed an independent consultative examination of Plaintiff.  (*Id.* at 790-91.)  Plaintiff had a normal physical appearance and full range of motion in the cervical spine, wrists, elbows, shoulders, hips, knees, and ankles and almost full range of motion in his lumbar spine.  (*Id.* at 790, 792-93.)  Plaintiff ambulated normally (without an assistive device) on his heels and toes and could squat.  (*Id.* at. 790, 793.)  Plaintiff's reflexes were generally suppressed, which was likely caused by his medications, but they were all present and equal.  (*Id.* at 790.)  Plaintiff had normal sensation and no atrophy (i.e., his calves were the same size).  (*Id.* at 790-91.)  An x-ray revealed no effusion or leg deformity.  (*Id.* at 790.)  Plaintiff had excellent alignment of the tibia-fibula and the fracture site was "super" healthy.  (*Id.* at 791.)  Plaintiff's argument that there is no "logical connection" to the ALJ's findings with regard to Plaintiff's leg injury finding is therefore also not supported by the record.

   **B.    Residual Functional Capacity**

Plaintiff's last two arguments are that the conclusions of the ALJ as to Plaintiff's residual functional capacity and the availability of alternate jobs are not supported by substantial evidence or an adequate rationale.

As noted above, the ALJ retained a vocational expert who testified at the hearing.  "[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work[.]" 20 CFR § 416.960(b)(2).  [A] vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data. *Biestek v. Berryhill,* 139 S. Ct. 1148, 1155 (2019).  To add, when arriving at a conclusion, the ALJ must provide "satisfactory explication of the basis on which it rests" to enable the reviewing court to perform its judicial review function. *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir. 1981).

At the hearing, the ALJ posed the following hypothetical question to the VE:

> . . . consider that the individual is able to perform at the medium level of exertion, such that the individual is able to lift or carry up to 50 pounds occasionally, 25 pounds frequently. The individual can stand or walk for six out of eight hours and sit for six out of eight hours. The individual can occasionally climb ramps and stairs, balance, kneel, stoop, and crouch. I'm sorry.
> The individual can frequently climb ramps and stairs, balance, kneel, stoop, and crouch. The individual cannot climb ladders, ropes, or scaffolds; cannot crawl. The individual cannot work around hazards, including moving mechanical parts or unprotected heights. The individual can understand and execute simple and routine tasks, where production is measured no earlier than the end of the workday. The individual can have occasional contact with coworkers and supervisors and incidental contact with the public but not with tasks that involve direct customer service. The individual can make simple decisions and adapt to occasional changes in essential work tasks.

(AR 103-105.)  It was the VE's opinion that Plaintiff would not be able to perform his past work given that hypothetical.  However, the ALJ asked the VE whether jobs existed in the national economy given the Plaintiff's age, education, work experience, and residual functional capacity. The VE testified that Plaintiff would be able to perform other work, namely in the form of hand packager, DOT Code 920.587-018; package sealer, DOT Code 920.685-074; and staple machine operator, DOT Code 692.685-202[8], and that these positions are sufficiently available in the national economy.  (*Id.* at 104.)

In making his RFC finding, the ALJ utilized the VE's testimony and lowered Plaintiff's current specific vocational preparation ("SVP")[9]  from a SVP level 6 (search analyst) and SVP level 8 (web designer) down to an "unskilled" SVP in order to account for Plaintiff's mental health conditions.  Additionally, Plaintiff's argument that there is no "logical connection" to the ALJ's RFC findings with regard to Plaintiff's leg injury finding is not supported by the record.  The ALJ makes RFC findings based on "all of the relevant medical and other evidence." § 404.1545(a)(1). It appears that she did so in making her finding as to Plaintiff's leg injury.  The ALJ found no evidence of "a gross anatomical deformity … chronic joint pain and stiffness with signs of

---

[8] These jobs fall into the category of medium-unskilled.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work. 20 CFR § 416.967(c).  Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs. 20 § 404.1568(a).

[9]  Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to a specific vocational preparation (SVP) of 1 to 2; semi-skilled work corresponds to an SVP of 3 to 4; and skilled work corresponds to an SVP of 5-9 in the Dictionary of Occupational Titles. S.S.R. 00-4p.

limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)."  (AR 18-19.) Furthermore, the ALJ did not find evidence that indicated an "inability to ambulate effectively" caused by a "major peripheral weight-bearing joint." (*Id.* at 19.)  The ALJ credited evidence that Plaintiff ambulated with an abnormal gait, but she found "little evidence of muscle atrophy, joint ossification or decreased strength." (*Id.*)  To add, the ALJ found that the record indicated Plaintiff was benefiting from medical treatment.  (*Id.*)  The Court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact finder. *Williams*, 970 F. 2d, 1182 (1982).  Therefore, following the Third Circuit's directive in *Williams*, the Court finds that the ALJ's RFC with respect to Plaintiff's leg injury was based on substantial evidence.

To conclude, the ALJ made a clear, rationale decision based not only on evidence in the record, but she also reasonably relied on the testimony and findings of the VE.  An ALJ may rely on the testimony of vocational experts in response to hypothetical questions when those questions accurately convey the claimant's impairments and limitations.  *Rutherford v. Barnhart*, 399 F.3d 546, 553-54 (3d Cir. 2005).  As such, the ALJ's reliance on the VE's testimony was proper. Furthermore, the ALJ's RFC findings and decision that Plaintiff could engage in alternative work provided sufficient reasoning for the Court to properly review the "explication" of the ALJ's conclusions regarding Plaintiff's RFC.  *See Cotter*, 642 F.2d at 704. Therefore, the ALJ's RFC findings were properly based on substantial evidence.

## III.  CONCLUSION

For the foregoing reasons, and for good cause shown, the Commissioner's decision to deny

Plaintiff benefits shall be affirmed.  An appropriate Order follows.


**Dated**: December 27, 2022

s/*Georgette Castner*
_____
**GEORGETTE CASTNER**
**United States District Judge**